MITCHELL et al. v. GULF, MOBILE &
OHIO R. CO. et al.

Civ. A. No. 537.

United States District Court
N. D. Alabama, W. D.

May 2, 1950.

176

Jerome A. Cooper and Hugo L. Black, Jr., Birmingham, Ala., for plaintiffs.

Jas. A. Simpson, of Lange, Simpson, Robinson & Somerville, Birmingham, Ala., Harold C. Heiss, Cleveland, Ohio, and Ralph M. Hoyt, Milwaukee, Wis., for defendants except defendant Gulf, Mobile and Ohio R. Co.

Frank W. Davies, Birmingham, Ala., for defendant Gulf, Mobile and Ohio R. Co.

MULLINS, Chief Judge.

This is a proper class action brought under the Railway Labor Act. Title 45, Chapter 8, U.S.C.A. The plaintiffs, who are Negro locomotive firemen, sue individually and as representatives of all other Negro locomotive firemen of the defendant Railroad similarly situated. The defendants are the Gulf, Mobile and Ohio Railroad Company, a corporation, hereafter referred to as the Railroad; Brotherhood of Locomotive Firemen and Enginemen, an unincorporated association, hereafter referred to as the Brotherhood; Local Lodge No. 769, otherwise referred to as the Warrior Lodge of the Brotherhood of Locomotive Firemen and Enginemen; and George E. Cox, who is chair-

man of said Local. This Court has jurisdiction of this action. Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 4 Cir., 148 F.2d 403.

The plaintiffs, as a basis for the relief prayed, aver that the Railroad and the Brotherhood have unfairly discriminated and conspired to discriminate against them in regard to seniority rights and job assignments as firemen; that the Brotherhood, which is the exclusive bargaining agent for the locomotive firemen on said Railroad, has not performed and has failed to discharge its statutory duty to represent equally the interests of all members of the craft. They further aver that the Brotherhood, in violation of law, has acted exclusively for the benefit and in the interest of its own membership, and discriminated against these plaintiffs and other Negro firemen, and deprived them of their right to work on fair and equal terms with white locomotive firemen who are alone eligible to be members of the Brotherhood; that to this end the Brotherhood has negotiated and entered into various agreements with the Railroad which discriminate against the plaintiffs and other Negro firemen similarly situated; and that all such discrimination has been practiced against them on the basis of race or color. They aver that under the present contract between the Brotherhood and the Railroad, firemen are described as "promotable" and "non-promotable" and that the term "promotable" means eligible to promotion to the position of locomotive engineer; that Negro firemen by the contract between the Brotherhood and the Railroad and the practice thereunder are classified as "non-promotable" and thereby made ineligible for promotion.

The plaintiffs contend that they and others similarly situated have been classified as non-promotable solely on the basis of race or color, and that as a result of such classification they have been denied their seniority rights and preferred job assignments as firemen or firemen-helpers.

In this proceeding the plaintiffs do not seek to secure rights to promotion as engineers, but they do seek to secure their seniority rights as locomotive firemen or helpers, which they contend have been denied to them on account of race or color. They pray for a declaration of their rights, a restoration of their seniority rights as locomotive firemen or helpers, and damages.

The various agreements between the Brotherhood and the Railroad's predecessor, effective from May 1, 1907 to May 1, 1924 (Plaintiff's Exhibit 4), contained seniority provisions for engineers and firemen substantially the same as those contained in the 1924 agreement and set out below. Beginning with the agreement of 1911, Negro firemen were excluded from running north of Tamms, Illinois, and south of Tamms they were restricted to 50 per cent of the total employment of firemen.

The basic agreement now subsisting between the Brotherhood and the Railroad became effective on May 1, 1924 (Railroad's Exhibit 1), and this agreement remains in effect except as it has been modified by the agreement of September 19, 1940 (Railroad's Exhibit 2); the agreement of November 15, 1946, effective December 1, 1946 (Railroad's Exhibit 3); and the agreement of July 19, 1947 (Railroad's Exhibit 4).

The 1924 agreement provided: "The rights of engineers and firemen to regular runs will be determined by seniority. * * * Senior firemen will have preference as to runs in the service in which engaged." (Article 26.) Such seniority rights were granted to both white and Negro firemen. But that agreement also provided that Negro firemen should not run north of Tamms and limited the number of colored firemen to be employed by the Railroad to not more than 50 per cent of the total number of firemen, and provided that not more than 50 per cent of the preferred assigned runs (passenger, freight or yard service) should be held by colored firemen. This agreement further provided that Negro firemen were not

to be discharged, but as they left the service or new firemen were employed, places would be filled by white men until the percentage of Negro firemen was reduced to 50 per cent. (Article 29.) These provisions limiting the rights of Negro firemen are to all intents and purposes the same discriminatory provisions contained in the "Southeastern Carriers Conference Agreement of February 18, 1941," and outlawed by the Supreme Court in three of its decisions.

The 1940 agreement provided that the Railroad would adopt, with certain exceptions, the terms of the so-called Chicago Agreement between the Brotherhood and other carriers. The Chicago Agreement provided that the railroads would employ helpers on diesel engines to be taken from the ranks of firemen, and did not restrict the firemen to be taken to white or promotable firemen. However, the agreement here provided that the Railroad would employ helpers on diesel engines to be taken from the ranks of firemen, these helpers to "be confined to those firemen duly qualified for service on such locomotives; and that only firemen in line of promotion shall be accepted as duly qualified for such service." It further provided that the term "in line of promotion" meant promotion from fireman to engineer, and that ."Non-Promotable firemen are understood to be those not considered eligible by the Management for promotion, and those who have declined or in future decline to take such promotion, or have failed or in future fail to pass qualifying examinations for such promotion." The effect of the 1940 agreement was to extend seniority rights on diesel equipment to helpers taken from the ranks of firemen, but it denied colored firemen the right to operate as helpers on diesels because both the Railroad and the Brotherhood classified them as "non-promotable."

The 1946 agreement established what is called a "Forced Promotion Rule" for firemen, but it did not apply to the plaintiffs because they were not promotable. Under this agreement, promotable firemen were required to take three successive examinations at 90 day intervals for the position of engineer and if they did not qualify on the third trial, they were to be dismissed from the service. However, this contract permitted all white firemen who had previously failed to pass examinations for engineer or had elected not to become engineers, to elect within 90 days from the date of the agreement to take the examinations for promotion. After this election was made, they were entitled to three examinations to qualify as engineers before they could be discharged from the service.

The 1947 agreement struck from the 1924 basic agreement the provision limiting Negro firemen to not more than 50 per cent of the jobs and preferred runs, but provided that promotable firemen should have preference as to runs in the service in which they were engaged. This agreement further provided that non-promotable firemen, which as a matter of practice under all contracts included all Negro firemen, when unable to get runs on steam locomotives, should have not more than 50 per cent of the assignments on all locomotives in yard service, including diesels; if they could not get yard service, they would be permitted to take their turn, in all except passenger service, with promotable firemen on the rotating extra board, irrespective of diesel-electric locomotives, provided the Management considered them qualified for diesel service.

The foregoing contracts cover the main line (Northern and Southern) division of the Railroad. It has three other minor divisions (Alabama, Louisiana and Tennessee) on which the contracts are the same, except that on those divisions Negroes are eligible for all yard service, not just 50 per cent.

All of the contracts between the Brotherhood and the Railroad recognize seniority rights for firemen.

To summarize, under the 1924 contract Negroes were entitled to not more than 50 per cent of the jobs as firemen and to not more than 50 per cent of the preferred runs, and enjoyed seniority rights along with the whites based on length of service.

Under the 1940 agreement white or promotable firemen were taken as helpers on diesels and retained their seniority rights, while Negro firemen were denied the right to operate on diesel equipment. By the 1947 agreement promotable firemen, which did not include Negroes, were given preference as to all runs, but non-promotable firemen, which included Negroes, were granted rights to not more than 50 per cent of the diesel yard assignments and conditionally to extra board assignments.

All of the plaintiffs have 25 or more years of service as firemen, the proof showing that the Railroad has not employed any Negro firemen since 1925. The plaintiffs and other Negro firemen employed by the Railroad were hired with the understanding they could never become engineers, and the evidence shows without dispute that both the Brotherhood and the Railroad have at all times under all contracts classified all Negro firemen as non-promotable solely on account of race. This railroad does not employ and, so far as the record shows, no railroad in the United States employs Negroes as engineers.

By 1946 when the "Forced Promotion Rule" was being negotiated, the Railroad was largely dieselized, and it was known that it would become completely dieselized. At that time, these Negro firemen, having as much as 20 to 40 years' service, were beginning to suffer for jobs because of the conversion to diesel engines, service on which was denied to them by the 1940 agreement. The Railroad insisted on including in the 1946 contract a provision which would have given these non-promotable Negro firemen the right to operate on yard diesels and to go on the extra board for diesel runs, but this was objected to by the Brotherhood, and the Negro firemen were not given these rights until the 1947 agreement granted them in part. By 1947 most of the Negro firemen were sitting at home unemployed, but at the insistence of the Railroad they were, in the 1947 agreement, granted the right to 50 per cent of the yard engine jobs and the right to go on the rotating extra board for freight runs on diesel equipment, if they could not get yard service.

A reading of the 1946 and 1947 agreements shows beyond all doubt that the Brotherhood opposed the granting of this "half loaf" to the Negro firemen in 1946, and did not yield to the Railroad's demand to grant them this limited service on its Northern and Southern divisions until the 1947 contract. The Brotherhood objected to the grant of this modicum notwithstanding the fact that prior to the 1946 contract it had entered into an agreement with the Railroad as to other of its divisions granting non-promotable colored firemen service on yard diesels and extra board rights, without the 50 per cent limitation as to yard service.

The defendant Railroad is now 100 per cent dieselized and it has no firemen or helpers except on diesel equipment. By virtue of the series of agreements between the Brotherhood and the Railroad and the practices thereunder, Negro firemen now find themselves excluded from all regular runs (both passenger and freight) and other job assignment rights to which their seniority would otherwise entitle them. By contrast, Negro firemen or helpers on the Southern, L. & N., and the A. C. L. Railroads are assigned to regular passenger and freight runs.

The defendants contend that the discriminations complained of are justifiable because it is necessary for all fireman-helper jobs on regular runs to be held by promotable men in order that they may be trained to be engineers. However, the assistent vice president of the Railroad testified that the helpers on diesels were not needed; that, to use his language, "It was just a good job to sleep on." He further testified the Railroad Company insisted that the 1940 contract provide that helpers on regular runs be limited to promotable firemen, which excluded Negroes, as the training of engineers was the only benefit the Railroad could obtain in using helpers on diesels. So far as the evidence here shows, the Brotherhood acquiesced in this demand without the slightest protest.

The defendants further say that the plaintiffs are not entitled to relief because they have failed to do equity in that they did not embrace a proposal made by the

Brotherhood on January 26, 1948 (see Railroad's Exhibits 5, 6, 7 and 8), and because certain other Negro firemen have temporarily enjoined the Brotherhood from negotiating the same proposal with other railroads. This proposal was to make all firemen, including the Negro firemen, promotable; to require them to stand examinations to be engineers; and if they failed, to dismiss them from the service.

The discriminations shown by the undisputed evidence in this case to have been practiced against the plaintiffs and other Negro firemen are substantially the same as those which were condemned and declared illegal by the Supreme Court in the case of Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and the companion case of Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, and this case falls squarely within the ambit of those cases. Subsequently, the Supreme Court, in Graham v. Brotherhood of Locomotive Firemen and Enginemen, 338 U.S. 232, 70 S.Ct. 14, 18, speaking through Mr. Justice Jackson, declared: "It would serve no purpose to review at length the reasons which, in the Steele and Tunstall cases, supra, *impelled us to conclude that the Railway Labor Act imposes upon the Brotherhood the duty to represent all members of the craft without discrimination and invests a racial minority of the craft with the right to enforce that duty. It suffices to say that we reiterate that such is the law.*" (Emphasis supplied.)

In the Steele case, the Supreme Court held that the Brotherhood, as the exclusive bargaining agent under the Railway Labor Act, was under the duty to represent the Negro members of the craft fairly and with the same fidelity that it represented the white members of the craft composing its membership, and that the Act imposed this duty notwithstanding the fact that Negro firemen were not eligible to membership in the Brotherhood.

The Court further held that discrimination as to seniority rights and job assignments based upon race or color was irrelevant and invidious and constituted a breach of duty imposed upon the Brotherhood by the Railway Labor Act, and that such unfair and illegal discrimination was subject to be enjoined and gave rights to claims for damages. The Supreme Court further declared that a bargaining agent which thus discriminates, as well as its members, could be enjoined from taking the benefit of such discriminatory action and that the Railroad is not bound by or entitled to take the benefit of the contract which the bargaining representative is prohibited by the statute from making.

The defendants take the position that the Steele, Tunstall and Graham cases are not controlling and rely upon the reasoning of Judge Hutcheson, in the opinion of the District Court for the Eastern District of Virginia, in the case of Rolax et al. v. Atlantic Coast Line Railroad Company 1950, 91 F.Supp. 585. In the Rolax case the agreement involved was the "Southeastern Carriers Conference Agreement of February 18, 1941," which provided, in effect, that 50 per cent of all available firing job assignments were to be allocated to colored firemen and 50 per cent to white firemen. The Court, in effect, approved this agreement, finding from the evidence it was reasonable for 50 per cent of the firing job assignments to be reserved for promotable white firemen, who could be trained to furnish future engineers for the Railroad. The Court there also held that the Negro plaintiffs had failed to do equity because they had not embraced the January 26, 1948 proposal (the same proposal made by the Brotherhood here), subjecting colored firemen to the "Forced Promotion Rule," which would require their dismissal from the service if they could not pass qualifying examinations as engineers; and because other Negro firemen had secured a temporary injunction in another court restraining the Brotherhood from negotiating such an agreement.

I disagree with the conclusion reached in the Rolax case because (1) the discriminatory provisions of the "Southeastern Carriers Conference Agreement of February 18, 1941," have been thrice declared invalid in the Steele, Tunstall and Graham cases, and I am unable to see how such dis-

crimination can be justified on any theory; (2) too much weight was given to the proposition of holding firing jobs open for the purpose of training engineers; and (3) I cannot agree that the plaintiffs there failed to do equity because they did not embrace the "Forced Promotion Rule" proposal which, when applied to Negro firemen, could only mean they would lose their jobs as firemen and be eliminated from railroad service.

I do not believe that the Steele, Tunstall and Graham decisions can be distinguished in a case where a discrimination is created by basing action on a classification perhaps otherwise legal (as a classification by the railroads of Negroes as not employable as engineers). The Supreme, Court, in affirming per curiam (281 U.S. 704, 50 S.Ct. 407, 74 L.Ed. 1128) the decision in City of Richmond v. Deans by the Court of Appeals for the Fourth Circuit (37 F.2d 712, 713), indicated that an illegal discrimination on the basis of color could not be made legal by basing such a discrimination upon a different but legal classification in turn based on color. The Fourth Circuit opinion said, with considerable parallelism to the present case: " * * * Attempt is made to distinguish the case at bar from these cases on the ground that the zoning ordinance here under consideration bases its interdiction on the legal prohibition of intermarriage and not on race or color; but, as the legal prohibition of intermarriage is itself based on race, the question here, in final analysis, is identical with that which the Supreme Court has twice decided in the cases cited." Here the Brotherhood cannot evade its duty to represent the colored members of the craft as required by the Steele, Tunstall and Graham decisions by basing a discrimination against them upon the requirements or desires of the Railroad for white engineers only.

Any defense based upon the necessity of holding positions open for training engineers largely, if not altogether, disappears under the evidence in this case. Here it is shown that the Railroad on three of its Districts, which constitute the main divisions here involved, now has fifty-seven junior qualified engineers who are acting as firemen-helpers because the Railroad has no positions open to them as engineers. As a matter of fact, if all the engineers holding regular runs on these districts suddenly dropped out of the picture, this Railroad would still have more qualified engineers than it now needs or will need in the foreseeable future.

I am unwilling to follow a ruling which holds that Negro firemen have failed to do equity by not embracing the proposal of the Brotherhood to subject them to the "Forced Promotion Rule," although at first blush it may appear fair to say that all firemen, both white and colored, should be dismissed from service if they cannot qualify for positions as engineers. Such a proposal is deceptive and a mere illusion in so far as these old Negro firemen are concerned because its adoption would only mean that they would lose their jobs as firemen. Such a proposal is but to keep the word of promise to the ear and break it to the hope.

When this proposal was made to Mr. Thompson, Assistant Vice President of the Railroad, he branded it as an iniquity. I agree with him. He said, "It is our judgment that practically all, if not all, of the non-promotable firemen now in our service would fail to qualify for promotion, and consequently would be 'dismissed from the service.' Most of these firemen have been in our service for twenty-thirty-forty years, and to dismiss them now after this long service solely because they are not qualified for promotion (which they never anticipated) would be an iniquity." (Railroad's Exhibit 8.) Mr. Thompson, when he referred to non-promotable firemen who had been in the service twenty-thirty-forty years, was talking about the colored firemen who are involved in this litigation.

In lieu of this proposal, Mr. Thompson submitted to the Brotherhood a counter proposal which would have permitted these Negroes to retain their jobs as firemen and unrestrictedly exercise their seniority with all other firemen and helpers until they reached the age of retirement. By its letter of March 15, 1948, the Brotherhood declined to accept the Railroad's counter

proposal. If the Brotherhood had accepted this counter proposal, the plaintiffs would have regained their seniority rights which they here seek to have restored. Such action by the Brotherhood would have only recognized equal seniority rights for all members of the craft and might have obviated this litigation. It is a wry anomaly that the Railroad was more concerned about its Negro firemen than the Brotherhood which was under a fiduciary obligation to represent them.

Mr. Thompson is not alone in his judgment that the proposal suggested by the Brotherhood would cause practically all of these Negro firemen to be dismissed from railroad service. Mr. Lee, the general chairman of the defendant Brotherhood for the Atlantic Coast Line Railroad Company, testified in this case that the adoption of this proposal would probably mean at least 75 per cent of the colored men would lose their jobs as firemen because they could not pass engineer's examinations.

In my opinion, the failure of the colored firemen to indorse this plan could not amount to a failure to do equity. On the other hand, the submission of such a plan by the Brotherhood, with knowledge on its part that its adoption could only mean dismissal of these men from the jobs they now hold, does not constitute equitable conduct toward or a fair representation of these old Negro men who, for 20 to 40 years, did back-breaking work on steam locomotives. I cannot censure Negro firemen for going into court to enjoin the negotiation of such a proposal. This is merely an act of self-defense on their part. These Negro firemen are old and will soon pass out of the picture. When one of them was asked before me if he wanted to become an engineer, he replied that it was just "too late in the evening" for him to become an engineer.

As Mr. Thompson pointed out, these men never anticipated that they would be required to stand examinations to become engineers. They were hired with the understanding that they could not become engineers, and have never been afforded an opportunity or given any incentive to study and train themselves to be engineers.

My decision in this case is not based on the theory that the Railroad is required to promote them to that position. Although they may not be entitled to become engineers, they are entitled to have the courts protect their seniority rights as firemen or helpers during the last few years they will remain in railroad service.

The final judgment of the trial court in the Tunstall case, D.C., 69 F.Supp. 826, restored Tunstall's seniority rights and awarded him damages. The Court of Appeals for the Fourth Circuit in affirming that judgment, Brotherhood of Locomotive Firemen, etc., v. Tunstall, 163 F.2d 289, 293, 172 A.L.R. 1345, certiorari denied 332 U.S. 841, 68 S.Ct. 262, 92 L.Ed. 413, stated the rule applicable to discrimination in the matter of job assignments, such as has been practiced here, in the following language: "The fact that the railroads have discriminated against Negroes in the matter of promotability, does not justify the Brotherhood, which represents them as bargaining agent, in making a further discrimination based on that discrimination. *Because the railroads do not permit Negroes to hold the position of engineer, is no reason why a bargaining agent representing them should use its bargaining power to deprive them of desirable positions as firemen which the railroads do permit them to hold.* This seems so elementary as not to permit of argument. Such action by a bargaining representative clearly violates the rule laid down by the Supreme Court in the Steele case, supra, as to what is permissible in collective bargaining." (Emphasis supplied.)

So far as the record in this case shows, the Brotherhood entered into and continued the basic agreement of 1924, which limited Negro firemen to not more than 50 per cent of the jobs and preferred runs, and the 1940 agreement which denied Negro firemen all right of assignment to the so-called "sleeping" jobs as helpers on diesels, without ever even entering a protest on behalf of the Negro members of the craft. Moreover, while negotiating the 1946 agreement, although the Railroad insisted that some crumbs be dropped to these Negro firemen by way of diesel

switch engine jobs and extra board diesel runs, the Brotherhood actively opposed this amelioration of the discrimination and until the execution of the 1947 contract, did not yield to the Railroad's demand that some little something be done to prevent these Negro firemen, with as much as 40 years' seniority, from walking the streets jobless.

Although Negro firemen since 1947 have been excluded from all regular passenger and freight runs, the Brotherhood has not protested and seems content to maintain a sphinxlike silence. Its conspicuous failure to seek any relief for Negro firemen in such a situation not only indicates its satisfaction with their total exclusion, but also makes manifest that it is pleased to have its own members enjoy these preferred assignments.

This record shows that the Brotherhood has been diligent in protecting the rights of the white firemen who are eligible for and constitute its membership. By contrast, the record shows that the Brotherhood has done nothing to protect the seniority rights and job assignments of Negro firemen. At times it has actively promoted discrimination against Negro members of the craft, climaxed by its January, 1948, proposal calculated to ease them out of the service completely. The conclusion is inescapable that the Brotherhood, in representing the Negro members of the craft, has signally failed to conduct the usual vigorous negotiations and demands which it is common knowledge are customarily employed by diligent unions in the representation of the members of a craft.

Finally the defendants say that it would be inequitable to grant the plaintiffs any relief because the Railroad now has nine or ten white firemen who are classified as non-promotable. The defendants contend that white and colored non-promotables are treated alike, but the record does not bear them out. Four of these white non-promotables are north of Tamms on a division not here involved and on which Negro firemen have never been permitted to run. The remaining fix or six were hired as promotables, and although some of them had previously failed examinations for engineer, by the 1946 contract they were given an option to continue as promotables and take further examinations. They finally became non-promotables because they declined promotion or failed to exercise their option under the 1946 agreement. On the other hand, these plaintiffs were hired as non-promotables and they have at all times been classified as such solely on a basis of race or color. The six whites were classified as non-promotable for reasons recognized as relevant by the Steele case, whereas the plaintiffs were arbitrarily so classified because of color. It is not improper or illegal for non-promotables who are so classified for relevant reasons to be dealt with in a different manner than promotables, even though such classification results in less desirable jobs for them.

Furthermore, the provisions of the 1946 agreement relating to white promotable firemen have not been strictly complied with as a white fireman by the name of Nolan who failed examinations for engineer as early as 1943 is still running on a preferred passenger run. If the 1946 agreement had been enforced as to white firemen, this man, not having qualified as an engineer, would have long since been dismissed from the service.

Plaintiffs are entitled to a declaratory judgment, injunctive relief and damages. A decree, in accordance with this opinion and the additional findings of fact and conclusions of law, will be entered.

### Findings of Fact, Conclusions of Law

This cause having come on for hearing on the plaintiffs' prayers for declaratory judgment, permanent injunction, and incidental damages and the Court having heard and considered the evidence and pleadings, and having examined the exhibits, having heard argument by counsel, and having filed its opinion herein, makes the following

### Findings of Fact

1. Plaintiffs Matt Mitchell, James Harris, George Sams, William Terrell, Otis Hodges, James Lenoir, Randle Jones, Albert Rentie Dozier, Reuben Thomas, Ernest

Lee Woodson, James Monroe Hawkins, Gus Hall, Lewis Jennings, Ocie Lynch, Will Hamlet Oliver, Joel Newman, Lindsey Stewart, Henry Lindsey, Nelson Smith, Lake Hursey, Eldridge Fote, Jenie Cosie Hall, Bunyon Blalock, Julius Crawford, Samuel Arthur Ezell, Alva L. Newton, Millard Price are Negroes and citizens of the United States employed by the Gulf, Mobile & Ohio Railroad Company (hereinafter called defendant railroad) as firemen. All plaintiffs have long seniority, based upon continuous service in their respective seniority districts, as firemen on the lines of the defendant railroad.

2. This is a class action brought by plaintiffs in their individual capacity and as representatives of all Negro locomotive firemen employed by the defendant railroad. There are common issues of law and fact affecting the rights of plaintiffs and other Negro firemen of the defendant railroad similarly situated.

3. Defendant railroad is a corporation operating as a common interstate carrier. It is engaged in, and is doing regular, continuous and substantial business in the Northern District of Alabama. The said Company maintains business and operating offices and numerous employees, solicits passenger and freight business, operates trains and carries on other regular and substantial business activities, all within said District.

4. Defendant Brotherhood of Locomotive Firemen and Enginemen (hereinafter referred to as Brotherhood) is a national unincorporated association whose membership consists in chief part of the locomotive firemen and engineers employed on various railroads engaged in interstate commerce including the defendant railroad company. Brotherhood acts as bargaining representative under the Railway Labor Act within the Northern District of Alabama and as such processes grievances for its members and enforces its contracts in this District through its Local Chairman defendant George E. Cox, a resident of Tuscaloosa, Alabama.

5. Defendant Local Lodge No. 769, known as the "Warrior" Lodge of the Brotherhood, is a Local Lodge whose membership includes white firemen employed by the defendant railroad in the Northern District of Alabama, and the defendant George E. Cox is a resident in the Northern District of Alabama, is the Chairman and executive officer of that Local Lodge, and is a true representative of the membership of that Lodge. Said defendants Local Lodge and Cox are true and adequate representatives of the Brotherhood and its members in this suit. The Brotherhood is and has in the past been the representative under the Railway Labor Act, 45 U.S.C.A. § 151 et seq., of the craft or class of locomotive firemen employed by the defendant railroad company. Defendant Brotherhood's members constitute and have in the past constituted the majority of the craft or class of locomotive firemen on most of the interstate railroads of the United States including the defendant railroad, and the defendant Brotherhood under and by virtue of the Railway Labor Act has acted as the sole bargaining agent and representative of the entire class or craft of locomotive firemen, including plaintiffs and others similarly situated. As such agent, Brotherhood negotiated agreements with the defendant railroad as to rates of pay, rules and conditions of employment for all members of the said class or craft, including the memorandum agreement which is Exhibit "A" to the complaint dated July 1947 (Railroad's Exhibit 4), the agreement dated November 13, 1946 (Railroad's Exhibit 3), the agreement dated September 19, 1940 (Railroad's Exhibit 2), the basic agreement dated May 1, 1924 (Railroad's Exhibit 1), and similar contracts which apply to the Tennessee, Alabama and Louisiana Divisions of defendant railroad. Negro locomotive firemen are now and have been in the past excluded from membership in the Brotherhood and do not have now and have not in the past had any voice in selecting or controlling the individual officers of the Brotherhood who determined and executed its collective bargaining policies and collective bargaining agreements, current and past, including the agreements referred to above in this paragraph.

6. The defendant railroad selects, and has for many years past selected, locomotive engineers from white locomotive firemen. The defendant railroad does not now and never has employed Negroes as locomotive engineers, and has hired no Negro firemen since 1925. Every Negro locomotive fireman now in the service of defendant railroad entered upon his employment as a locomotive fireman with no expectation of ever being required to take any promotional examinations for, or of ever becoming, an engineer, and in fact no Negro fireman has either been required or permitted to take such examinations. Only white firemen have been considered eligible by the defendant railroad to become engineers.

7. Defendant railroad and defendant Brotherhood, as representative of the craft of locomotive firemen and helpers under the Railway Labor Act, entered into agreements, including the agreement which is Exhibit "A" to the complaint (Railroad's Exhibit 4), and agreements referred to in Finding No. 5, containing provisions which in effect and by regular practices thereunder restrict, on the basis of race, the rights of these plaintiffs and other Negro firemen similarly situated with respect to employment, job assignments, seniority rights and other conditions of employment.

8. The opinion filed in this case is to be treated as a part of these findings of fact and conclusions of law. The pertinent provisions of all agreements between defendants Brotherhood and railroad are summarized in the opinion.

9. As a result of and pursuant to the said provisions of said agreements, these plaintiffs and other Negro firemen have been displaced from assignments as locomotive firemen to which they would have been entitled by virtue of their seniority had they been dealt with upon the same basis as white firemen, and have been assigned to jobs which were less desirable, less remunerative and more onerous. Plaintiffs and other Negro firemen similarly situated as a result of and pursuant to the said provisions, have been denied rights to preferred runs and to positions as firemen on steam locomotives and as helpers on diesel locomotives.

10. White firemen have been permitted, under said agreements, to transfer their seniority based upon continuous service on steam engines, to jobs upon diesel engines. Negro firemen have not been equally and fairly permitted under the provisions of said agreements to do so.

11. The proposal in the notice of January 26, 1948 (Railroad's Exhibit 7), for the taking of promotional examinations, was formulated by the defendant Brotherhood. No Negro fireman was permitted to approve or disapprove or participate in the formulation of this proposal. No Negro fireman ever had the opportunity to participate in the election of any Brotherhood officer who acted in the formulation of the proposal or in the collective bargaining negotiations to be based on same.

12. The proposal, in the notice of January 26, 1948, is unfair and discriminatory against Negro firemen, threatens their job seniority and would cause them irreparable harm, because at least 75%, and probably all, of these Negro firemen could not pass the proposed examination, and the Brotherhood is aware of their inability to do so.

13. The denial of fair treatment to plaintiffs in regard to their seniority and job assignments is not justified or required by the defendant railroad's needs for operational efficiency or by the defendant railroad's needs for training its engineers and potential engineers.

14. There are, already trained and available, considerably more engineers than there are engineering jobs on defendant railroad's lines. There is no shortage of trained engineers and no such shortage is imminent.

15. Negro firemen are a steadily decreasing percentage of the total firemen employed by defendant railroad.

16. The defendant railroad has found plaintiffs qualified for employment as firemen on diesel engines.

17. Other railroads have permitted Negro firemen to exercise seniority rights on road runs of the type from which plain-

tiffs have been excluded by the discriminatory provisions of the above agreements.

18. The defendant Brotherhood, as the sole bargaining agent and representative of the entire class or craft of locomotive firemen including plaintiffs, upon defendant railroad's lines, has made no demands upon the railroad to eliminate or remove, from the agreements, said provisions unfairly denying plaintiffs' seniority rights as firemen.

19. The defendant Brotherhood is continuing and threatens to continue to insist upon the application by the defendant railroad of the provisions of the aforesaid agreements further to discriminate against these plaintiffs and others similarly situated with respect to job assignments and to continue to deny them preferred runs as firemen on diesel locomotives. And defendant railroad is continuing and threatens to continue to apply said provisions against plaintiffs and others similarly situated.

20. The illegal discrimination practiced by the Brotherhood against the plaintiffs has proximately caused damage to the plaintiffs in that it has proximately caused plaintiffs to be assigned to and to work at jobs that have been less desirable and less remunerative than the jobs to which plaintiffs would have been assigned had such illegal discrimination not been practiced by the Brotherhood.

21. The failure of defendant Brotherhood to represent plaintiffs fairly, impartially, and without hostile discrimination, caused plaintiffs not to be assigned to jobs and preferred runs upon the basis of continuous service.

22. The denial to plaintiffs of assignments as helpers on diesel locomotives, pursuant to the terms of said provisions and practices thereunder, constitutes irreparable injury for which there is no adequate remedy at law.

On the basis of the foregoing findings of fact, the Court makes the following

### Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter and venue is properly laid.

2. The Brotherhood of Locomotive Firemen and Enginemen as collective bargaining representative under the Railway Labor Act of the entire craft or class of locomotive firemen employed by the defendant railroad owes a statutory, fiduciary duty, and a duty of agency, to represent all members of the craft or class fairly and impartially and without discrimination.

3. The defendant Brotherhood has not represented plaintiffs, and other Negro firemen similarly situated, fairly and without discrimination, because of plaintiffs' race.

4. The provisions limiting and restricting plaintiffs' seniority rights as firemen because plaintiffs are "non-promotable" or colored, or denying plaintiffs' seniority based upon continuous service, in the contract which is Exhibit "A" to the complaint (Railroad's Exhibit 4) in the contracts dated November 13, 1946 (Railroad's Exhibit 3), dated September 19, 1940 (Railroad's Exhibit 2), dated May 1, 1924 (Railroad's Exhibit 1), to the extent kept in effect since passage of the Railway Labor Act, and in similar contracts which apply to the Tennessee, Alabama and Louisiana Divisions of defendant railroad discriminate against, apply unfairly to, do not amount to good faith collective bargaining representation of plaintiffs and the class plaintiffs represent, and are illegal; in particular, but without limitation, paragraphs 2 and 4 of Exhibit "A", paragraph 4 of the 1940 contract, and paragraph 29(b) of the 1924 contract, and similar provisions in the contracts applying to the Tennessee, Alabama and Louisiana Divisions of defendant railroad are so illegal.

5. Plaintiffs are entitled to seniority rights under existing contracts and practices between defendants Brotherhood and Railroad which firemen enjoy when said illegal provisions are not applied. As a court of equity, this Court must shape its decree to give plaintiffs adequate relief by placing plaintiffs in the positions they would have if the illegal provisions had been absent from the contracts, so that defendants may not retain the profits or benefits of the illegality involved in the execution of those provisions. Plaintiffs' seniority rights based upon continuous service

exist so long as contracts and practices recognized by or existing between the defendants Railroad and Brotherhood give effect to Article 26 of the 1924 contract read in the light of paragraphs I, IV, and V of the 1940 contract, or to similar provisions in the Tennessee, Alabama and Louisiana Division contracts or to provisions in any other contract or contracts negotiated, or to be negotiated, by the Brotherhood as agent under the Railway Labor Act for the entire craft of firemen by the terms of which white firemen enjoy seniority based to any extent or in any manner upon continuous service. So long as white firemen, by contract or practice existing between the railroad and the Brotherhood, exercise seniority based on continuous service, these colored firemen must exercise that right.

■ 6. The defendant Brotherhood has failed to discharge its statutory duty to the class of Negro firemen represented by plaintiffs by failing and refusing equally and similarly to seek the benefits sought and obtained for the white members of the fireman craft.

7. The proposal of January 26, 1948, referred to in Finding No. 11, would further discriminate against plaintiffs in violation of the Brotherhood's duty owing to plaintiffs as bargaining agent of the entire craft.

8. Plaintiffs are entitled to an injunction against each defendant and incidental damages against the Brotherhood for breach of the Brotherhood's statutory fiduciary duty and duty of agency fairly to represent plaintiffs and to compensate plaintiffs for their losses caused by that breach of those duties.

9. "Seniority rights", as referred to herein and in the judgment in this case, means rights to preferred runs and job assignments and related benefits arising out of contract, express or implied, between the Railroad and the Brotherhood.

■ 10. Since it is found to be a fact that the Brotherhood has caused plaintiffs' damages by the illegal discrimination practiced against plaintiffs, the fact that the exact amount of such damages may not be capable of exact proof will not prohibit the plaintiffs from recovery of such amount of damages as may be established by reasonably satisfactory evidence.

■ 11. Plaintiffs' incidental damages should include an amount representing the difference between plaintiffs' actual earnings and the respective amounts plaintiffs would have earned had each of them been assigned jobs and preferred runs upon the basis of continuous service seniority as was done for white firemen, together with amounts equivalent to any other losses proximately caused by said illegal discrimination.

■ 12. The issues in this action are not triable of right by a jury and the claims of plaintiffs for incidental damages can most appropriately and expeditiously, in the discretion of the Court, because of the stress of business in this District, the number of individuals to be examined, and the nature of the individual claims, be determined by a reference to a master for an accounting thereof.

■ 13. Defendant Brotherhood stood (and now stands) in a fiduciary relationship to plaintiffs, and such claims for breach of duties accruing in a fiduciary relationship are not ordinarily subject to limitations. Benners v. First National Bank, 247 Ala. 74, 22 So.2d 435. However, by analogy to the Alabama statute of limitations applicable to actions in contract, the Court holds that it will be equitable to limit plaintiffs' claims for damages to a period of six years.

14. An injunction should issue to embody the above and to (a) restrain the Brotherhood and the defendant railroad from further carrying out or complying with the aforesaid provisions of the above agreements referred to in Conclusion of Law 4, or of practices thereunder, and said proposal referred to in Conclusion of Law 7, or of any similar agreement or proposal or practice which prevents or would prevent plaintiffs from enjoying the preferred runs and employment rights to which their seniority based upon continuous service entitles them so long as white firemen receive job assignments by seniority based upon continuous service, and (b) to re-

quire the defendant railroad, within thirty days of the effective date of the injunction, to assign each of plaintiffs to the respective preferred run or job to which such seniority entitles him, so long as white firemen are assigned to preferred runs and jobs by seniority based upon continuous service, under the present contract or any future contract, express or implied.